UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re:<br><br>SEATTLE JEWELRY & LOAN, INC.,<br><br>Debtor. | NO. 15-10340-TWD<br><br>DECLARATION OF DIMETRIOS G. MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS |

I, Dimetrios Georgio Marinakis, declare and state as follows:

1.  I am co-founder, chief executive officer, and 100% owner of Seattle Jewelry & Loan, Inc., d/b/a Pawn Pros ("Pawn Pros"), established in 1995. I have worked in the pawn industry since I was 21 years old, and I have more than two decades experience in pawn shop management.

2.  With 6 locations, Pawn Pros is the second-largest chain of pawn shops in the Seattle metro area, and we are the largest local chain (national chain Cash America is the largest otherwise).

3.  Pawn Pros currently has 34 employees, whose salaries in turn provide financial support for a total of 58 dependents. There is the CEO, a COO, store managers, a book keeper, office workers, and store employees. Pawn Pros' employees perform a variety of critical functions. Their skills, knowledge, and understanding of Pawn Pros' infrastructure, operations,

DECLARATION OF DIMETRIOS MARINAKIS IN
SUPPORT OF FIRST-DAY MOTIONS - 1

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

{02742149.DOC;1}

Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 1 of 17

and customer relations are essential to the effective reorganization of the Debtor's business. If wages and benefits go unpaid, employee morale and loyalty will suffer during the reorganization. The short period unpaid prepetition salary owed to my employees and me is $35,150.51.

4. Based on its current store configuration, Pawn Pros will extend more than $3 million in consumer micro-loans this year.

5. According to the 2012 United States Census, there are 183 pawn shops in Washington State.[1] The industry employs more than 1,000 people in this State. Moreover, a pawn competitor has credibly claimed that the industry cumulatively extends $100,000,000 in loans to Washington consumers each year.

6. The pawn industry (NAICs code 522298) not only provides significant employment, but also provides, as compared with credit cards or payday loans, a more fiscally-responsible, collateral-based borrowing option for low-income individuals.

7. The pawn industry is of increasing relevance in the United States, as in the aftermath of the Great Recession, many people with low credit scores lack traditional lending options when the need arises.

8. Based on these market demands, Pawn Pros' stores are strategically located in low and mid-income neighborhoods in the Seattle metropolitan area. I personally choose the locations of the stores based on market research, particularly considering demographics, prevailing foot traffic, and competitor location.

9. Pawn Pros' six locations are a White Center flagship store (opened in 1996), Everett (2004), Kent (2009), Federal Way (2010), Bremerton (2012), and Tacoma (pending). At separate times, Pawn Pros has also had stores in Skyway/Rainier and Monroe.

10. Separate companies which I own 100%, hold title to the real property on which the White Center, Everett, Kent, and Tacoma stores are located. Pawn Pros leases the Federal

---

[1] http://censtats.census.gov/cgi-bin/cbpnaic/cbpdetl.pl.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 2

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

{02742149.DOC;1 }
Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 2 of 17

Way and Bremerton stores from arm's length third parties.

11. I personally built up the Pawn Pros business without the benefit of any bank financing, relying on family loans and the profits generated from the White Center store to finance the Everett store, the profits of those two stores to open the Kent store, then the Federal Way and other stores (as will be explained, the only exception to this is the Bremerton store, opened in 2012).

12. Throughout my career in this business, I typically work late hours, 6 days a week.

13. My daily duties as CEO of Pawn Pros consist of the following:

- The day begins with check-in calls with the five managers for my five different stores. My corporate headquarters are located in the basement of my house.[2]

- In the mornings, I analyze the prior day's purchases and loans from the five stores on our business traveling software, and make assessments as to (a) whether Pawn Pros should prioritize buying over lending, (b) the appropriate mix of goods to loan against or purchase in light of storage space constraints (in which case, small jewelry is favored over bulky electronics items), and (c) rates of loan origination per store.

- During this period prior to opening at 10 a.m., I specifically spend time checking with all the managers to determine available cash levels for lending.[3] Based on my assessment of needs for the various stores, I dispatch couriers who transport cash among the various stores.

- I work out of the White Center flagship store in the late mornings, and typically

---

[2] I relocated Pawn Pros here in November 2014 under pressure from my commercial landlord who was renting the Company space for separate corporate offices. Historically (pre-2011), however, I have run the corporate office for Pawn Pros from my home.

[3] Available cash-on-hand for loans is the life blood of the pawn business, and if there is not enough money at one store, but too much cash at another store, Pawn Pros could potentially be in a situation where at one location, we cannot extend loans which are being sought by consumers, while having cash sit idly at another location.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 3

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

{02742149.DOC;1 }
Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 3 of 17

- can be found on the floor greeting customers, as I am literally the face of the store in the community, having been there for 20 years.

- While on the floor, I will field regular questions throughout the day over phone, Skype, and texts from my five managers, who are seeking guidance on various management or customer issues which may arise.

- While all my managers have authority to negotiate individual transactions under $500 in value or sales without significant discounts on listed price, I personally approve all other more significant transactions. I negotiate or approve approximately 50 different transactions per day, and spend up to three hours on the phone considering and evaluating such deals.

- Furthermore, whenever nontraditional items are brought in to one of the five stores for sale or as collateral for loans, I personally make the valuation determinations (typically on Skype, so I can see the items).

- In the case of a particularly high value item (such as a claimed Rolex watch), I will physically drive to the store where the item is being presented, to inspect for authenticity. As a result, if I am not fielding calls in White Center, I regularly will be in transit between stores.

- Irrespective of viewing particular items for sale, every day I typically drive from White Center to at least one other different store in order to supervise or resolve various issues which may arise. I will visit each of the five operating stores at some point during the week, although perhaps slightly more of my time is either spent at the White Center store or at the corporate offices. In addition to weekly meetings with each of my store managers, I have daily meetings with my chief operating officer, Edgar Martinez.

- If disputes arise with customers as to whether their items have been lost or damaged, properly redeemed, or if there is any allegation raised of attempted

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 4

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

{02742149.DOC;1 }

Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 4 of 17

fencing, I am responsible for and personally resolve all such issues.

- I also deal with bills and vendor contracts, although in addition to an inventory and business tracking system, as well as Quickbooks, I have a bookkeeper and my uncle, retired from the restaurant industry, similarly helps with administration.

14. A significant turning point for me in my business occurred in 2010,[4] when the largest chain in Seattle, Pawn X-Change (40 stores), (one spot higher than Pawn Pros in the local market), was purchased by a national chain for $70 million, on a multiple of approximately 9x earnings.[5]

15. This development five years ago encouraged me to consider the possible benefits of further regional expansion. Though I had never worked with third-party lenders for financing my business in the past, in approximately 2010, I turned for the first time to Foundation Bank for a modest ($300,000) line of credit to expand inventory and loan availability.

16. In 2011, I transferred my business to Washington Trust, the former lender for Pawn X-Change. I was particularly interested in working with a lender who claimed to understand the mechanics and capital requirements of the unique cash-intensive space in which my business operates.

17. For its part, Washington Trust was extremely interested in acquiring me as a client given that, though I was 1/4 the size of Pawn X-Change, my profit margin on transactions was materially higher.

18. I attribute the high profit margins associated with my business (in excess of 50%) to Pawn Pros' (my) ability to accurately value the wide range of collateral the business purchases and lends on. In this, I rely on my two decades' worth of experience in the business, including

---

[4] http://www.cashamerica.com/AboutUs/CompanyHistory.aspx.

[5] http://www.ryanswansonlaw.com/attorneys/michael_jay_brown.html (sale price).

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 5

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

the training I received working at Liberty Loan in downtown Seattle in the early 1990s before opening Pawn Pros.

19. By not overpaying or overlending on given items, Pawn Pros is able to generate the most amount of reasonable profit in the industry. While I believe that I have trained my specific store managers well, a large part of Pawn Pros' strategic advantage relates to my personal valuation skills, as well as my experience in allocating the appropriate inventory and specific store mixes of sales and loans.

20. As the Court will learn, this filing was motived in part by Washington Trust's request for the appointment of a general receiver for Pawn Pros. This seemed unwise to me when considering the best interest of all creditors of my company.

21. Not only is a general receiver simply charged with liquidating a business, but also such a receiver would not have the industry-specific knowledge concerning identifying valuable watches and jewelry, be unable to estimate the value of rare coins, and would not be adept at understanding the dynamics in loan negotiation in maximizing yield, while ensuring regular cash flow returning to the business. I have a duty to protect all creditors, and the Bank's approach of liquidating would result in diminishing (or plummeting) margins and would not generate profits sufficient to repay anyone other than Washington Trust.

22. Pawn Pros' advantage in the market also arises from an intentional strategic plan to keep overhead low,[6] and adopting what could be called a "warehouse aesthetic" in presenting, marketing, and storing inventory and collateral. I am also happy to report that Pawn Pros has a general reputation in the industry for superior customer service.

### WASHINGTON TRUST BANK: LOAN HISTORY

23. Washington Trust extended a line of credit to Pawn Pros in 2011 for $750,000, and in 2014, it was subsequently expanded to $1.5 million. Upon information and belief, the

---

[6] I anticipate Washington Trust will comment on my former salary as not being an indication of low overhead, and I have taken action on this line item, reducing my personal salary by 40% to $150,000 per year.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 6

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700    fax 206 587 2308

{02742149.DOC;1}

balance of the loan as of the petition date is $1,553,784.10.  Upon information and belief, to secure this indebtedness, the Bank filed a security interest in substantially all of its assets, and recorded with the Washington State Department of Licensing to perfect its security interest.  The primary use of this financing was to acquire inventory and facilitate the opening of Pawn Pros' megastore in Bremerton in 2012 (three-times the square footage of our White Center store).[7]  Upon entering into the line of credit arrangement, the Bank required that Pawn Pros implement more standardized business practices, such as setting up a formal business headquarters, hiring a chief financial officer, and standardizing and professionalizing its accounting systems.  While I appreciate that many of these requests were motivated to make Pawn Pros more successful, and groom it to become the next Pawn X-Change, these steps required that I no longer "walk the floor" and stay in regular contact with my stores.  I nonetheless agreed with the Bank's requests.  I am not casting blame, however, in hindsight, my distance from critical functions of the business led to certain oversights.

24.     Pawn Pros was on good relations with Washington Trust through 2014.

25.     Properly speaking, Pawn Pros has experienced no "business" failure since it began its association with Washington Trust.  Nonetheless, Pawn Pros has suffered from a string of misfortunes, each of which is avoidable in the future.

26.     First, Pawn Pros experienced a significant IRS tax problem in 2012.

27.     In late 2011, gold rose to record high prices.  This caused enormous profits as the value of Pawn Pros' substantial historical inventory in precious metals almost doubled, and the high price of gold prompted high rates of customers to come in with gold collateral to pledge for loans.

---

[7] Apart from the Washington Trust line of credit, Pawn Pros only has one other loan secured by its inventory, loans, or cash, and that is a short-term, high interest loan to Cann Capital in the amount of slightly less than $9,000.  There is also UCC-1 filings on the business from APZB Industries and Opalescent Enterprises, for which it is not clear there is any amount due, and/or these may be alter egos for Cann Capital.  The IRS now has also imposed a non-consensual loan on the business.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 7

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA  98104
office 206 587 0700   fax 206 587 2308

28. Pawn Pros substantially underestimated the necessary withholding given this significant (100%) uptick in its business, and instead plowed the cash back into the business to extend further loans while trying to establish the new Bremerton store.

29. This tax bill was paid out in part from a significant distribution that Pawn Pros made to me personally.

30. Both the tax problem and the payment of the distribution caused Washington Trust to substantially increase their scrutiny of my business practices, and demand stricter controls and enhanced offerings of security.

31. Pawn Pros had to deal with another significant business challenge right after obtaining the original Washington Trust line of credit, when in January and then again in February 2012, the White Center flagship store twice was the subject of armed robberies.

32. In attacks captured on video, the thieves made off with more than $475,000 in jewelry. The robbers remain at large. These spectacular events were widely publicized in the media.[8]

33. Insurance paid Pawn Pros out for this loss, and the Company ultimately received a replacement multiple for its stolen inventory.

34. Nonetheless, this did not account for the fact that a significant portion of the whole chain's inventory was temporarily rendered unavailable for sale to customers for a period of more than a year, causing sales to fall.

35. The final complication for my business is that soon after the prior tax and theft incidents occurred, I started to scout for additional pawn shop expansion opportunities in California.[9]

---

[8] http://www.komonews.com/news/local/Robbers-use-guns-bats-to-take-down-White-Center-pawn-shop-138021133; html; http://www.kirotv.com/videos/news/watch-it-white-center-pawn-shop-robber-caught-on/vChXy/.

[9] My estimate is that a similarly-situated store to my existing locations in Washington State, but in California, would generate 4 times as much profit due to the demographics and heightened demand for non-traditional lending.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 8

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

36. To that end, my wife and I rented a house in Dana Point, California for the entirety of 2013. While I physically worked in Seattle during the weeks, I regularly flew down to California in attempts of developing this new project.

37. I did not disclose what I was doing to Washington Trust, because my speculation was that if Pawn Pros became more than a local chain, the Bank would become difficult to work with if I were to also work with other California-based lenders.

38. While I was focused on this potential expansion, I also increasingly delegated broader management authority to others in running the Washington State business.

39. Because I could not give my lender good reasons as to why I was regularly traveling, and given the set-backs involving the robberies and the tax issue, Washington Trust appears to have suspected the worst. In hindsight, I realize I could have done much better in communicating with my lender.

40. Due to the prior success of my business, I was able to indulge in my passion for collecting valuable cars. Perceiving me to be squandering Pawn Pro assets, and engaging in a lavish lifestyle filled with travel, Washington Trust demanded in 2014 that I sell all my cars, and turn over all my personal jewelry

41. I complied with the Bank's request as to the cars, and as of the petition date, I have sold my four most valuable cars.[10] I also complied, without protest, with the request to deposit with Washington Trust certain personal jewelry owned by my wife and myself as collateral worth $125,000. This jewelry is currently held by Washington Trust in its vaults.

42. Since 2014, Washington Trust has imposed increasingly challenging business constraints on Pawn Pro. Specifically, whereas previously Pawn Pros' line of credit had only been secured by the Company's inventory and loans, the Bank demanded additional security interests in most of the real property which I own through wholly-owned subsidiaries, including

---

[10] Because none of the automobiles had equity in them, I was unable to resell them quickly, and in most instances, merely surrendered the vehicles back to the lenders.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 9

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

{02742149.DOC;1 }

Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 9 of 17

the land on which the White Center, Kent, and Tacoma stores are situated.

43. Though I have a store established in Tacoma, filled with inventory and ready to be opened, the Bank has not authorized me to open it, although this can be done profitably by time-sharing staff from other stores. The Tacoma store has been dormant for a year, waiting for Washington Trust to authorize us to open the doors. I will now evaluate a reopening as this case progresses and would intend to do so if such action is in the best interest of the creditors of this estate.

44. Furthermore, to appease the Bank and come up with a significant partial repayment, I was forced to liquidate all the inventory at the Rainier and Monroe stores in 2014 and lay off 13 employees.[11]

45. In any event, Washington Trust declared Pawn Pro in violation of its loan documents in March 2014, and immediately increased our monthly payment obligation from $6,000 to $20,000 per month, which higher payment Pawn Pros paid for a number of months.

46. In an effort to make these heightened payments for a time, Pawn Pro deferred paying required state taxes, and was dangerously forced to cannibalize its inventory.

47. As a pawn business, Pawn Pro earns the overwhelming amount of its profits either by lending out cash on hand for interest payments or reselling gold inventory it acquires at sub-wholesale rates, for retail prices. Washington Trusts' tightening of pressure on my business by forcing Pawn Pros to turn over a significant portion of its own cash flow has undermined this basic fundamental of Pawn Pros' business.

48. On the one hand, by increasing my debt-service requirements to Washington Trust by $14,000 per month, Pawn Pros now has insufficient cash on hand to lend out for originating high-interest loans.

---

[11] Pawn Pro attempted to generate about $400,000 for Washington Trust in 2014, and hopefully it received some of what it was owed, but unfortunately, state taxing agencies began sweeping company accounts around this time, so it appears the State, and not Washington Trust, may have been the primary beneficiary of the closed stores.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 10

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

{02742149.DOC;1 }
Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 10 of 17

49. On the other hand, Pawn Pros has literally been forced to melt down large portions of its gold inventory, and instead of selling it for retail prices, it obtains wholesale prices.

50. For example, if the heightened $14,000 of monthly mortgage payment requires that Pawn Pro sell jewelry for scrap, the business is deprived of the opportunity of reselling that same gold, over a longer period of time, for as much as $55,000 – good for Washington Trust but not good for the creditors of the company.

51. I believe that Washington Trust's demands on this one aspect of Pawn Pros' business alone have cost it $41,000 in monthly profits during the time the company paid mortgage payments at the default rate.

52. Recognizing the precarious state in which my business now lies, one year ago I stopped all efforts at expansion beyond the State of Washington.

53. Over the last six months, I have substantially rebuilt the business, as I have returned to hands-on control of day-to-day operations of Pawn Pros.

54. Nonetheless, the unreasonable conditions being imposed on me by Washington Trust are now ironically preventing me from repaying my Bank, have resulted in the non-payment of certain critical obligations of the company, and have interrupted my ability to service my ongoing tax obligations.

55. Now the tax obligations, however, have become my foremost problem, as since June 2014, the State has begun regularly garnishing the company's bank account at Bank of America. $120,000 was seized from Pawn Pros' account right at the end of December 2014.

56. The sweeps of Pawn Pros accounts have had a highly disruptive effect on our business which are causing us irreparable harm, as they are imperiling the future viability of the business. For example, because the proceeds of credit card sales are deposited straight into our bank account, we ceased accepting credit card sales two weeks ago. Upon information and belief, this has cost us approximately $10,000 in sales over this period.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 11

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

{02742149.DOC;1}

Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 11 of 17

57. Moreover, the State of Washington's garnishments has forced us to have to find work-arounds to payment of employee salaries, such that we are operating on a near cash-only basis, to avoid both the taxing authority and the Bank seizing our cash.

58. These work-arounds include melting gold inventory down and delaying payments to certain vendors and landlords.

59. Having ready access to adequate cash however is critical to the ongoing success of a pawn business, because the majority of the profits are generated by the spot cash loans which Pawn Pros extends. Without available cash flow, Pawn Pros cannot make loans and is prevented from earning interest on such loans. Again, this is causing irreparable harm to the Pawn Pros business.

Moreover, uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of the Debtor's orderly liquidation of its inventory. Should the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted.

60. But for the significant business interruptions caused by the inability to maintain bank accounts, all stores have significant inventories, robust lending practices, and good locations. Apart from the obvious defects noted above, Pawn Pros continues to be a good business, generating significant profits.

61. Furthermore, significant equity exists in Pawn Pros as a going concern. As set forth in **Exhibit A**, February through July 2015 Cashflow, attached hereto, the business has:

- $1.486 million in accounts receivable (loans outstanding);
- $1.034 million in inventory at retail prices;[12] and

---

[12] This figure is less than the $1.437 million which until this day of filing, Pawn Pros believed that it had in inventory. The reason for the discrepancy was that the Company was incorrectly double-counting two items. First, I had been incorrectly considering the jewelry possessed by the Bank as collateral to be part of inventory. Second, over recent months, Pawn Pros had been melting down jewelry in order to enhance liquidity. The employee tasked with accounting for these transactions was let go in 2014, and unfortunately the $1.437 million figure did not account for these transactions. I take full responsibility for this, and am correcting the record so that there is full

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 12

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700  fax 206 587 2308

{02742149.DOC;1}

Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 12 of 17

- is projected to generate $560,000 in cash profits over the next six months.

62. Furthermore, there is little basis to any concern by Washington Trust that its $1.55 million loan would be undersecured, because in addition to security interests in the above, the Bank enjoys the pledge of the following collateral by third parties:

- possession of $125,000 of my personal jewelry;
- a $194,000 equity position in the White Center real property (junior mortgage), which property I estimate is worth $560,000;
- a $271,000 equity position in the Kent real property (senior mortgage), which property I estimate is worth $700,000; and
- a $283,000 equity position in the Tacoma real property (junior mortgage), which property is worth $600,000.

63. The current value of all the above is approximately $ 3.95 million dollars, which far exceeds the $1.55 million owed to Washington Trust, and slightly exceeds the estimated $3.85 million owed cumulatively to all creditors.

64. In my opinion, Pawn Pros is solvent from a balance sheet perspective.

65. However, Pawn Pros' cash needs have to be stabilized, which will be achieved through the imposition of the automatic stay and beginning a more controlled restructuring process for the benefit of all creditors. The business needs the protection of bankruptcy in order to not have to worry that one creditor or another will try to seize cash or some asset to satisfy its individual obligation.

66. The strategic plan I foresee as a result of filing bankruptcy consists of the following steps:

- Use the automatic stay to stay further garnishments of my bank accounts, stop collection litigation, and prevent the receivership.

---

transparency for my creditors as to the financial health of Pawn Pros. In addition, at least 10% of our inventory may need repairs or slight modifications prior to being retail-sale ready.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 13

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

{02742149.DOC;1}

- With this Court's permission, reestablish interest-only payments to Washington Trust.
- Pay ongoing tax and lease payments for store and store equipment.
- Reestablish normal use of bank accounts, and deposit funds generated by business into bank accounts.
- Conduct assessment of the viability of each store, consider whether to reject leases for non-owned stores, and determine whether to open the Tacoma store.
- Continue to oversee operations, and ensure that all managers are committed to Pawn Pros' long-term success, while maintaining consistency and industry best practices.
- Evaluate all expenses and ongoing obligations, streamlining procedures where possible.
- Improve bookkeeping and accounting protocols, as appropriate.
- Work on cash flow modeling for filing the plan of reorganization, while exploring mechanisms for refinancing the line of credit currently owed to Washington Trust.
- Establish modest (radio) advertising budget and promotions to develop additional business.

67. Pawn Pros is a business I personally created, managed, and successfully built up over the last 18 years. I have overwhelming pride and commitment to Pawn Pros, and I believe it can become the next Pawn X-Change. This business is my legacy. I pledge my undivided attention, commitment, and wholesale efforts to restoring my company to being the model for all pawn shops in the Seattle metropolitan region. I know that not just the livelihoods of my family of employees depends on the Company's success, but that if I am to treat my creditors as best as possible, I must do what I can to make this effort work.

68. I unambiguously agree to do everything requested of me by the Court to make this happen in accordance with the requirements of the Bankruptcy Code.

DECLARATION OF DIMETRIOS MARINAKIS IN SUPPORT OF FIRST-DAY MOTIONS - 14

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

{02742149.DOC;1}
Case 15-10340-TWD    Doc 7    Filed 01/21/15    Ent. 01/21/15 23:47:23    Pg. 14 of 17

1  
2   I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
3  AND CORRECT.
4   DATED this 21st day of January, 2015.
5
6   /s/   D. Marinakis
7   Dimetrios Marinakis

DECLARATION OF DIMETRIOS MARINAKIS IN
SUPPORT OF FIRST-DAY MOTIONS - 15

CAIRNCROSS & HEMPELMANN, P.S.
ATTORNEYS AT LAW
524 2nd Ave, Suite 500
Seattle, WA 98104
office 206 587 0700   fax 206 587 2308

# February through July 2015 Cashflow

|  | Feb15 | March15 | April 15 | May 15 | June 15 | July 15 | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| Interest | 113,298 | 96,667 | 89,218 | 89,030 | 85,234 | 93,285 | 566,732 |
| Sales | 301,000 | 310,000 | 295,000 | 296,291 | 303,000 | 325,000 | 1,830,291 |
| Gold Scrap | 46,000 | 48,250 | 52,659 | 47,500 | 53,000 | 55,000 | 302,409 |
| pick ups | 301,108 | 233,356 | 236,159 | 230,561 | 180,380 | 202,199 | 1,383,763 |
| Gross Revenue In-Q1-2014-Monthly Average | 761,406 | 688,273 | 673,036 | 663,382 | 621,614 | 675,484 | 4,083,195 |
| Loans | 275,000 | 336,407 | 324,701 | 287,906 | 276,408 | 309,983 | 1,810,405 |
| Buys | 31,000 | 42,344 | 32,767 | 26,878 | 28,678 | 23,444 | 185,111 |
| Pre Operating Expenses In-Q1-2014- -Monthly Average | 306,000 | 378,751 | 357,468 | 314,784 | 305,086 | 333,427 | 1,995,516 |
| **Remaining Cash** | **455,406** | **309,522** | **315,568** | **348,598** | **316,528** | **342,057** | **2,087,679** |

### Payroll Expense

|  | Feb15 | March15 | April 15 | May 15 | June 15 | July 15 | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| Payroll , Net | 94,985 | 64,000 | 64,000 | 64,000 | 64,000 | 64,000 | 414,985 |
| Officer Marinakis Payroll | 16,666 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 79,166 |
| Payroll Tax-941 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 132,000 |
| Employment Security-ESD | 3,450 | 3,450 | 3,450 | 3,450 | 2,548 | 2,548 | 18,894 |
| LNI-Workers Comp | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 4,200 | 25,202 |
| Dental & Vision Insurance | - | - | - | - | - | - | - |
| Medical Insurance | - | - | - | - | - | - | - |
| Garnishment | - | - | - | - | - | - | - |
| *Total Monthly Payroll* | *141,300* | *106,150* | *106,150* | *106,150* | *105,248* | *105,248* | *670,246* |

### Tax & License

Business Taxes and Licenses

|  | Feb15 | March15 | April 15 | May 15 | June 15 | July 15 | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| Sales Tax | 30,000 | 31,000 | 29,500 | 29,600 | 30,030 | 32,500 | 182,630 |
| B&O Tax | 2,070 | 2,171 | 2,370 | 2,138 | 2,385 | 2,475 | 13,608 |
| **Total Sales/B&O Tax** | 32,070 | 33,171 | 31,870 | 31,738 | 32,415 | 34,975 | 196,238 |

### Ongoing Expense

|  | Feb15 | March15 | April 15 | May 15 | June 15 | July 15 | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| Telephone/Internet/TV | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Computer Expense | 725 | 725 | 725 | 725 | 725 | 725 | 4,350 |
| Garbage & Recycle | 750 | 1,500 | 750 | 750 | 750 | 750 | 5,250 |
| Water | 1,600 | 3,200 | 1,600 | 1,600 | 1,600 | 1,600 | 11,200 |
| Electric & Gas | 6,900 | 12,400 | 6,200 | 6,200 | 6,200 | 6,200 | 44,100 |
| Security & Alarm | 600 | 600 | 600 | 600 | 600 | 600 | 3,600 |
| Storage-Mobile Mini | 744 | 744 | 744 | 744 | 744 | 744 | 4,464 |
| Merchant Fees | 291 | 525 | 371 | 378 | 281 | 281 | 2,126 |
| Bank Service Fee | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| Auto Expenses and Gas | 736 | 500 | 400 | 662 | 633 | 633 | 3,564 |
| Store Supplies | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 9,000 |
| Insurance | 3,433 | 3,433 | 3,433 | 3,433 | 3,433 | 3,433 | 20,598 |
| Rents | 44,392 | 44,392 | 44,392 | 44,392 | 44,392 | 44,392 | 266,352 |
| **Total Monthly Ongoing Expense** | 63,171 | 71,019 | 62,215 | 62,484 | 62,358 | 62,358 | 383,604 |

### Professional Fees

|  | Feb15 | March15 | April 15 | May 15 | June 15 | July 15 | TOTAL |
|---|---:|---:|---:|---:|---:|---:|---:|
| Accounting | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 18,000 |
| Legal | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 17,000 | 102,000 |
| **Total Professional fees** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **20,000** | **120,000** |

Court Fees

**EXHIBIT A - 1**

# February through July 2015 Cashflow

| | | | | | | | |
|---|---:|---:|---:|---:|---:|---:|---:|
| US Trustee Payment | | 2,167 | 2,167 | 2,167 | 2,167 | 2,167 | 2,167 | 13,002 |
| *Long/Short term Loans* | | | | | | | | |
| Washington Trust Loan | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 36,000 |
| Navitas | | | 1,854 | 1,854 | 1,854 | 1,854 | 1,854 | 9,272 |
| Bank of the West | | | 845 | 845 | 845 | 845 | 845 | 4,223 |
| Tube Art | | | 983 | 983 | 983 | 983 | 983 | 4,913 |
| Financial Pacific Loan 1 | | | 1,378 | 1,378 | 1,378 | 1,378 | 1,378 | 6,889 |
| Financial Pacific Loan 2 | | | 1,066 | 1,066 | 1,066 | 1,066 | 1,066 | 5,329 |
| Cann Capital | | 9,000 | | | | | | 9,000 |
| Bank of America LOC | | 2,513 | 2,513 | 2,513 | 2,513 | 2,513 | 2,513 | 15,075 |
| **Total Loans & Lease** | | **17,513** | **14,638** | **14,638** | **14,638** | **14,638** | **14,638** | **90,701** |
| | | | | | | | | |
| Camelia Marinakis | | | | | | | | |
| Emmanuel Marinakis Loan1 (In Rents) | | 5,592 | 5,592 | 5,592 | 5,592 | 5,592 | 5,592 | 33,554 |
| Emmanuel Marinakis Loan2-(In Rents) | | | | | | | | - |
| **Total Personal Loans** | | **5,592** | **5,592** | **5,592** | **5,592** | **5,592** | **5,592** | **33,554** |
| | | | | | | | | |
| *Vehicle Lease/Financing* | | | | | | | | |
| Vehicle Financing | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 18,000 |
| Vehicle Lease | | | | | | | | |
| **Total Vehicle Monthly Lease/Finance** | | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **3,000** | **18,000** |
| | | | | | | | | |
| **Total Monthly Expenses** | | **284,814** | **255,737** | **245,631** | **245,768** | **245,418** | **247,978** | **1,525,346** |
| | | | | | | | | |
| **Cash Available** | | **170,592** | **53,785** | **69,937** | **102,830** | **71,110** | **94,079** | **562,333** |
| | | | | | | | | |
| **Collateral** | | | | | | | | |
| Inventory | | 1,034,000 | 1,034,000 | 1,034,000 | 1,034,000 | 1,034,000 | 1,034,000 | |
| Accounts Receivable (Loans) | | 1,486,611 | 1,337,950 | 1,337,950 | 1,486,611 | 1,486,611 | 1,486,611 | |
| Total Inventory + AR | | 2,520,611 | 2,371,950 | 2,371,950 | 2,520,611 | 2,520,611 | 2,520,611 | 2,520,611 |
| | | | | | | | | |
| White Center Property (worth $560,000) WT second | | 194,000 | 194,000 | 194,000 | 194,000 | 194,000 | 194,000 | 194,000 |
| Kent Property (worth $700,000) WT first | | 271,000 | 271,000 | 271,000 | 271,000 | 271,000 | 271,000 | 271,000 |
| Tacoma Property (worth $600,000) WT second | | 283,000 | 283,000 | 283,000 | 283,000 | 283,000 | 283,000 | 283,000 |
| Personal Jewelry held by WT | | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 |
| | | | | | | | | 3,955,945 |

**EXHIBIT A - 2**